IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Richmond Division)

| | |
|---|---|
| Katerine B. Rivas-Lemus, | ) |
| *Plaintiff*, | ) |
| v. | ) Civil No.:  3:21-cv-00528 |
| Henrico County; Henrico County Sheriff's Office; Michael L. Wade, Former Sheriff, Henrico County, in his individual and official capacity; Alisa Gregory, Sheriff, Henrico County, in her individual and official capacity; JOHN DOES 1 through 10, in their individual and official capacities; | ) |
| *Defendants*. | ) |

## **COMPLAINT**

### PRELIMINARY STATEMENT

1. The Defendants willfully detained Katerine B. Rivas-Lemus ("Plaintiff") in violation of her constitutional rights under 42 U.S.C. § 1983. In summary, Defendants:

    a. Unlawfully detained Plaintiff at Henrico County Jail West from August 17, 2019 through August 19, 2019 pursuant to an immigration detainer request, even though Plaintiff was present in the U.S. in lawful DACA status, and even though a magistrate judge had ordered an unsecured bond;

    b. Strip searched and performed a pregnancy test of the Plaintiff prior to processing her into Henrico County Jail West and detaining her in conditions that were humiliating, overly crowded, poorly ventilated, and unsanitary; and

1

    c. Conducted all the behaviors listed above with deliberate indifference for the conditions that Plaintiff was likely to face, pursuant to an official policy, practice, or custom in a manner that willfully and wantonly violated plaintiff's right, in breach of Defendants' official duties, a failure to follow protocol, and in a manner that was grossly negligent.

## JURISDICTION

2. This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, 1343, and Article III of the United States Constitution, as Plaintiff seeks redress of deprivations to her civil rights secured by the United States Constitution.

3. This court has supplemental jurisdiction over Plaintiff's claims based on Virginia law, as they are so related to claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

4. Suit is authorized by 42 U.S.C. § 1983.

5. Venue is proper in this district and division because all of the actions took place within this district and Defendant's offices are within this district.

## PARTIES

6. Plaintiff, Katerine B. Rivas-Lemus, is a resident of Virginia, present in the United States in lawful immigrant status as someone who has received Deferred Action for Childhood Arrivals (DACA). She is a graduate of Hermitage High School in Henrico County, has been gainfully employed in Henrico County, and is an active member of her local church congregation where she helps coordinate efforts to help the homeless. She also is involved in volunteer activities collecting toys, beds, blankets, and food for the Richmond Animal League.

7. Defendant Henrico County is a political and administrative subdivision of the Commonwealth of Virginia.

8. Defendant Michael L. Wade is the former sheriff of Henrico County, and during the events surrounding the Complaint was the current and acting sheriff of Henrico County. Together with Defendant Henrico County Sheriff's Office, he operated Henrico County's Jail West in Henrico County, Virginia, and was responsible for maintaining the safety and security of the jails and courthouses in Henrico County. These responsibilities now fall to Defendant Alisa Gregory, current sheriff of Henrico County.

9. Defendants John Does 1 through 10 are officers of the Henrico County Sheriff's office.

## FACTUAL ALLEGATIONS

*Plaintiff Held and Processed into Jail Despite*

*Issuance of an Unsecured Bond*

10. Defendant Henrico County Sheriff's Office, together with Defendant Michael L. Wade, operated Henrico County's Jail West in Henrico County, Virginia from August 17, 2019 through August 19, 2019. Defendant Alisa Gregory currently is responsible for Henrico County Jail West operations.

11. Defendant Michael L. Wade, as sheriff, had custody and control of all persons confined in Henrico County Jails and was responsible for the day-to-day operations of the Henrico County Jail West during the events outlined below.

12. At approximately 1:00 AM on August 17, 2019, Plaintiff was arrested in response to a domestic dispute phone call and taken to Henrico County Jail West. Initially, Plaintiff was informed she would be released in short order after receiving a PR bond from a magistrate judge.

13. However, Plaintiff also viewed paperwork stating, erroneously, that she was intoxicated. After informing sheriff's deputies that she had not had anything to drink, Plaintiff was later told she needed to wait until 6:00am to be released when she would be "sober." Plaintiff requested a sobriety test to prove she was not intoxicated—a deputy denied her request stating, "We don't do that here."

14. At approximately 6:30am, after noticing that other people being held in the same waiting area as Plaintiff were allowed to leave, Plaintiff made multiple inquiries about when she would be released.

15. Finally, at approximately 9:00am, Plaintiff asked about her release again when a sheriff's deputy returned to the holding area and took Plaintiff to a magistrate judge who gave Plaintiff an unsecured PR bond ordering her release.

16. The magistrate judge told Plaintiff she would be released soon because she had no criminal record. The deputy then returned Plaintiff to the waiting area in the jail.

17. After 30 to 45 minutes, a deputy came to the holding area, called for Plaintiff, and informed her they would be booking her into the jail despite the fact she had just been ordered released.

   *Sequence of Events: Issuance of the ICE Detainer Request and Release Order*

18. **At approximately 8:30am** on August 17, 2019, the Henrico County Sheriff's office appears to have received DHS Form I-247A, Immigration Detainer – Notice of Action, also referred to as an ICE hold, ICE detainer, immigrant detainer, or immigration detainer request.

19. The ICE hold indicated that DHS had determined there was probable cause that Plaintiff was a removable alien because "Biometric confirmation of the alien's identity and a

records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the alien either lacks immigration status or notwithstanding such status is removable under U.S. immigration law."[1]

20. The ICE hold goes on to state, "IT IS THEREFORE REQUESTED THAT YOU:

   a. Notify DHS…before the alien is released from your custody…

   b. Maintain custody of the alien for a period **NOT TO EXCEED 48 HOURS** beyond the time when he/she would otherwise have been released from your custody… The alien **must be served with a copy of this form** for the detainer to take effect. This detainer…should not impact decisions about the alien's bail, rehabilitation, parole, [or] release…" *See* Exh. A, Form I-247A issued on Aug. 17, 2019. [emphasis in original].

21. On the back of the ICE hold form, a NOTICE TO THE DETAINEE provides important information to individuals held subject to an ICE hold.

22. In a failure to follow protocol, Plaintiff was never served with a copy of the immigration detainer request issued on DHS Form I-247A, Immigration Detainer – Notice of Action. As a result, in accordance with the plain language of the form itself, **the detainer request never took effect**.

23. **At 9:16am** on August 17, 2019, a "RELEASE ORDER" was issued in Plaintiff's matter. The language of the Magistrate Judge's order contrasts starkly with the language of the ICE detainer request, and states as follows: "TO THE SHERIFF, JAIL OFFICER OR

---

[1] Notably, around the timing of the issuance of the ICE detainer in this matter, the Central District of California issued an injunction limiting the issuance of immigration detainer requests because the federal databases mentioned in paragraph 25 are inaccurate, incomplete, and error-filled, thus failing to establish the probable cause necessary to issue such a detainer. *See Gonzalez v. ICE*, No. 2:12-cv-09012-AB, slip op. at 30-36 (C.D. Cal. Sep. 27, 2019). By way of one example, from May 2015 through February 2016, ICE's database led to the issuance of 12,797 detainer requests, but "771 were subsequently lifted because the individuals were either U.S. citizens or otherwise not subject to removal." *See id*. at 22.

CORRECTIONAL OFFICER: You are ordered to RELEASE the accused on the above charge(s)." *See* Exh. B, Release Order issued on Aug. 17, 2019. [emphasis in original].

24. Subsequent to the issuance of the RELEASE ORDER, Henrico Sheriff's Deputies booked Plaintiff into the jail.

*Plaintiff is Processed into the Jail, Strip Searched, and is*

*Subjected to an Unwanted Pregnancy Test*

25. In a female deputy's presence, Plaintiff was required to strip naked, turn around, bend over, and cough. After this, the deputy gave Plaintiff a cup and instructed her to pee in it before putting on a blue jumpsuit.

26. Plaintiff was subsequently taken to a nurse who conducted a pregnancy test. Plaintiff was under the impression the pregnancy test was mandatory for all inmates.

27. After the unwanted pregnancy test, Plaintiff requested the opportunity to use the bathroom, which was denied.

*Plaintiff Endures Humiliating, Overly Crowded, Poorly Ventilated,*

*and Unsanitary Conditions in Henrico Jail*

28. Plaintiff was ultimately directed upstairs in the jail, and guided to a hallway filled with jail cells. Plaintiff was provided with a mat (for sleeping on the floor), and a pillow case containing a blanket, a ziploc bag containing a toothbrush, toothpaste, soap, and deodorant, but no pillow. Plaintiff was placed in one large cell, with six smaller room-like cells inside. Each room-like cell contained three beds, and one bathroom. Even though the space and number of beds suggests it was designed to hold about 12 to 18 people, there were between 35 and 40 women in Plaintiff's cell.

29. As Plaintiff entered her cell, she was struck by the sheer number of women in such an enclosed space. She describes conditions in the room as "women, on the floor, everywhere" and that there was not really room to walk. Plaintiff ultimately found the only available spot to lay her mat, under a table in the room. Because she still needed to use the bathroom, Plaintiff searched for a bathroom in her cell.

30. A toilet was present in each of the six room-like cells. Plaintiff was unable to access some of the rooms because inmates who had laid claim to the individual beds, a scarce resource in the overcrowded jail, refused her entry to their room claiming they didn't want her to stink up their room. When Plaintiff finally obtained access to a toilet, she was presented with unsanitary conditions that she describes as "gunk" on the toilets and sinks.

31. The toilets and sinks were never cleaned during Plaintiff's weekend at the jail.

32. Plaintiff asked another inmate where she could get toilet paper because none was available near the toilet. The inmate directed Plaintiff to the deputies. Plaintiff subsequently asked a deputy multiple times for toilet paper to be brought to the cell before giving up, and attempting to sleep in the only space available—in a fetal position in her spot on the floor under a table.

33. Plaintiff believes she slept for about two hours, and then again asked for toilet paper on multiple occasions, but no toilet paper was brought. A fellow inmate, seeing how desperate Plaintiff was becoming, finally offered Plaintiff some of "her" toilet paper, and Plaintiff was able to use the toilet. It was at this point that Plaintiff discovered toilet paper, like the limited beds, was also a scarce resource in the jail.

34. During the remainder of her time in jail, from Saturday, August 17, 2019, through Monday, August 19, 2019, Plaintiff continued to be subjected to humiliating encounters and denials for reasonable accommodations by sheriff's deputies, specifically:

    a. Plaintiff endured abnormally hot conditions;

    b. Plaintiff was sexually harassed by another inmate;

    c. Plaintiff complained of a headache and was denied medicine; and

    d. Plaintiff was not provided adequate sleeping accommodations.

*Unbearable Heat*

35. Throughout her entire time in the jail, Plaintiff complains of stifling and unbearable heat.

36. Together with the overcrowding, the heat and unsanitary conditions led to a bad, stinky smell that filled the entire room.

37. In the large, overcrowded cell where Plaintiff slept on a mat under a table, a single fan circulated air through the room. The fan was positioned near a window where deputies were stationed to oversee the room. On occasion, deputies would turn the fan to face their window, instead of toward the open room.

*Sexual Harassment by Inmate*

38. At about 5am on August 18, 2019, a fight broke out in Plaintiff's cell over use of one of the bathrooms. One of the women involved was taken to "the hole." An inmate invited Plaintiff to come out from sleeping under the table and come sleep near her in the spot where the woman who had been taken to the hole had been sleeping.

39. From her new spot on the floor, Plaintiff attempted to sleep when an inmate began touching Plaintiff's backside. Plaintiff adjusted to move away from the other inmate, but the inmate persisted. Plaintiff glared at the other inmate in an attempt to stop the incident.

40. Plaintiff feared that telling the deputies about the harassment would lead to further consequences against her, including that she could possibly be subjected to even worse behavior by other inmates or even be sent to "the hole."

*Headache Medicine Refused to Plaintiff*

41. On Sunday, August 18, 2019, Plaintiff asked a deputy for medicine for a painful headache. The deputy responded to Plaintiff by saying, "We can do it tomorrow." At this point, Plaintiff had made multiple attempts to sleep on a mat on the floor under a table, had not enjoyed uninterrupted access to a bathroom with toilet paper, had to obtain drinking water from a sink with "gunk," and had been unable to sleep to prevent sexual harassment. Unfortunately, Plaintiff's reasonable request for headache medicine was denied.

*ICE Detainer "Lifted" and Plaintiff Released*

42. Plaintiff was released from the jail at approximately 3:30pm on August 19, 2019 after ICE "lifted" their detainer request. Notably, the copy of DHS Form I-247A stamped "Lifted" also indicates the form was never served on the Plaintiff, and thus it did not "take effect." The section titled "To be completed by the law enforcement agency currently holding the alien…" remains blank. *See* Exh. C, "Lifted" ICE Detainer Request.

43. The charge for which Plaintiff was arrested in the early morning of August 17, 2019 has been dismissed.

*Plaintiff's Ongoing Harm from her Unlawful Detention*

44. Since her release, Plaintiff reports experiencing intense anxiety, vertigo, nausea, vomiting, potential hallucinations, PTSD, and other symptoms she did not experience prior to her arrest and detention.

45. Plaintiff has received medical treatment to help her manage the trauma—mental and emotional—she suffered during her time in jail.

*Defendants' History of Maintaining Cruel and Unusual, Overly Crowded, Poorly Ventilated, and Unsanitary Conditions in Henrico Jail*

46. Overcrowding in Henrico County Jails is a well-known and well-documented problem, with news coverage on the issue dating back to 2017 and ranging into the events experienced by the Plaintiff. *See* Tracy Sears, *Henrico jail's rising women population leaves people sleeping on floor*, CBS6 WTVR (Oct. 9, 2017, 11:49 PM), https://wtvr.com/2017/10/09/henrico-jails-rising-women-population-leaves-people-sleeping-on-floor/. Henrico jails experienced overcrowding, even as the inmate population elsewhere in the state declined. *See* Davis Burroughs, *Henrico officials don't know why county's jail population is increasing, despite regional decline in incarceration*, THE DOGWOOD (July 15, 2019, 7:47 PM), https://vadogwood.com/news/henrico-officials-dont-know-why-countys-jail-population-is-increasing-despite-regional-decline-in-incarceration/.

47. The heat Plaintiff endured is corroborated by news reports indicating that the temperature reached as high as 85 degrees. *See* Karina Bolster, *'It's about 80 degrees in here': Jail dealing with A/C problems*, NBC12 (July 16, 2019, 6:41 PM), https://www.nbc12.com/2019/07/16/its-about-degrees-here-jail-dealing-with-ac-problems/. In one news piece, Defendant Wade commented that "The areas where we get the most complaints out of are in the female cells which are up in the corner facing the sun… Today those temperatures were 85, 82 and 81." *See id.*

48. By April 2019, even though there was public awareness and debate on the issue of overcrowding in Henrico County Jails, Henrico County officials failed to act despite a known pattern of constitutional deprivations. *See* Chris Suarez, *Henrico officials debating whether to build low-security jail focused on addiction recovery*, RICHMOND TIMES-DISPATCH (Apr. 5, 2019), https://richmond.com/news/local/crime/henrico-officials-debating-whe...urity-jail-focused/article_cac3ae54-ca91-5545-b9c3-5f877e0c73a2.html.

49. Defendant Henrico County was well aware of the Henrico Jail overcrowding issues (*see id.*), and knew how the overcrowding problem was impacting individuals in Plaintiff's position; however, Defendant Henrico County ultimately adopted a policy of municipal inaction.

*Defendants' Unlawful Policies, Practices, and Customs*

50. At no time did the Defendants provide Plaintiff with a copy of DHS Form I-247A, nor did they provide her with any opportunity to challenge her continued detention based solely on the immigration detainer request.

51. At no time during her detention in Henrico County Jail West, or since, have ICE officers made any attempts to arrest Plaintiff or take her into custody.

52. Since the Virginia Attorney General's January 5, 2015 opinion that ICE detainers are non-mandatory requests (*See Legality of ICE Detainer Requests*, 14-067 Op. Va. Att'y Gen (2015), *available at* https://www.oag.state.va.us/files/Opinions/2015/14-067_Stolle.pdf), public data indicates that Virginia jurisdictions have received approximately 14,650 detainer requests. In that same time period, Defendants have received approximately 620 of those requests.[2]

---

[2] *Latest Data: Immigration and Customs Enforcement Detainers*, TRAC IMMIGRATION, https://trac.syr.edu/phptools/immigration/detain/ (last visited Aug. 11, 2021). Syracuse University's Transactional

53. Defendants have a policy, practice, or custom of:

   a. delaying the release of certain inmates, as they coordinate with ICE in the event an immigration detainer request may be issued;

   b. failing to inform certain inmates they are being held solely as a result of an ICE detainer request, and failing to provide those inmates with a copy of the ICE detainer request;

   c. misleading inmates regarding the opportunity to be released, solely due to the existence of an immigration detainer request, notwithstanding the fact that a court has set bail or a judge has ordered an inmate be released;

   d. detaining certain inmates for an additional 48 hours after they would normally be released, in violation of their constitutional rights, solely due to the existence of an immigration detainer request. These inmates would otherwise be released because their criminal matter has been resolved or they are otherwise entitled to release;

   e. detaining certain inmates for a period of time beyond 48 hours from when they would normally be released, in violation of their constitutional rights, solely due to the existence of an immigration detainer request. These inmates would otherwise be released because their criminal matter has been resolved, the immigration detainer request has expired, and they are entitled to release;

   f. performing an unlawful search and seizure by way of a mandatory pregnancy test when processing female inmates into their jail; and

---

Records Access Clearinghouse (TRAC) obtained the data listed here from ICE as a result of successful litigation. Additional information regarding the information compiled is available at https://trac.syr.edu/phptools/immigration/detain/about_data.html.

    g. detaining certain inmates with deliberate indifference for the cruel and unusual, overly crowded, poorly ventilated, and unsanitary conditions they face while detained pursuant to an immigration detainer request.

54. Because of Defendants' unlawful actions, Plaintiff has suffered loss of liberty, loss of enjoyment of life, humiliation, mental suffering, emotional distress, stress, and other non-economic losses in an amount to be determined at the time of trial.

## CLAIMS FOR RELIEF

### Count I

Fourteenth Amendment Violation – Due Process Violation;

42 U.S.C. § 1983; Va. Const. art. 1, § 11

55. Paragraphs 1 through 54 are incorporated as if realleged herein.

56. When Plaintiff was brought to Henrico County jail and initially detained, Defendants misled the Plaintiff regarding the true reason they did not release her as they waited for ICE detainer paperwork, thus depriving Plaintiff of her liberty without due process of law.

57. After a Magistrate Judge issued a Release Order, Defendants then formally processed Plaintiff into Henrico County Jail West where she was detained from August 17, 2019 through August 19, 2019, based solely on a non-mandatory immigration detainer request, which they failed to serve on the Plaintiff, thus depriving Plaintiff of her liberty without due process of law.

## Count II

Fourth Amendment Violation – Unlawful Seizure;

42 U.S.C. § 1983; Va. Const. art. 1, §10

58. Paragraphs 1 through 54 are incorporated as if realleged herein.

59. After a Magistrate Judge issued a Release Order, Defendants then formally processed Plaintiff into Henrico County Jail West where she was detained from August 17, 2019 through August 19, 2019, based solely on a non-mandatory immigration detainer request, which they failed to serve on the Plaintiff, thus constituting an unlawful seizure in violation of the 4th Amendment.

60. Before admitting Plaintiff to the jail, Defendants conducted an unwanted pregnancy test on the Plaintiff, thus resulting in an unlawful seizure in violation of the 4th Amendment.

## Count III

Eighth Amendment Violation – Cruel and Unusual Punishment;

42 U.S.C. § 1983; Va. Const. art. 1, § 9

61. Paragraphs 1 through 54 are incorporated as if realleged herein.

62. "[H]ousing inmates in a grossly overcrowded facility violates the inmates' rights to be free from cruel and unusual punishments." *See Brown v. Mitchell*, 308 F. Supp. 2d 682, 693 (E.D. Va. 2004).

63. While detained in Henrico County Jail West, the Plaintiff was subjected to humiliating, overcrowded, poorly-ventilated, and unsanitary conditions in the jail, thus constituting cruel and unusual punishment in violation of the 8th Amendment.

## Count IV

## False Imprisonment

64. Paragraphs 1 through 54 are incorporated as if realleged herein.

65. The tort of false imprisonment in Virginia is "restraint of one's liberty without any sufficient legal excuse therefor by word or act which he fears to disregard, and neither malice, ill will, nor the slightest wrongful intentions is necessary to constitute the offense." *Montgomery Ward & Co. v. Freeman*, 199 F.2d 720, 723 (4th Cir. 1952).

66. When Plaintiff was brought to the Henrico County jail and initially detained, Defendants misled the Plaintiff regarding the true reason they did not release her as they waited for ICE detainer request paperwork, thus restraining the Plaintiff's liberty without any sufficient legal excuse.

67. Defendants failed to serve a copy of the Form I-247A on the Plaintiff, and thus, according to the plain language of the document itself, the detainer request failed to "take effect." Subsequent to a Release Order issued by a Magistrate Judge, Defendants then formally processed Plaintiff into Henrico County Jail West where she was detained from August 17, 2019 through August 19, 2019, thus restraining Plaintiff's liberty without any sufficient legal excuse.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court:

1. Award compensatory and punitive damages in an amount to be determined at the time of trial;

2. Issue an injunction preventing Defendants from honoring immigration detainer requests in the future;

3. Award Plaintiff's attorney's fees and costs pursuant to 42 U.S.C. § 1988;

4. Grant any other and further relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff requests a Jury Trial on all the issues so triable.

                          Respectfully Submitted,

                          Katerine B. Rivas-Lemus

Dated: Aug. 16, 2021                By: /s/ Jacob Tingen
                                        Jacob Tingen
                                        VSB No. 84543

                                        Trent Powell
                                        VSB No. 84323

                                        James Williams
                                        VSB No. 95064

                                        Charles Petran
                                        VSB No. 94940

                                        Tingen Law, PLLC
                                        1801 Bayberry Court, Suite 203
                                        Richmond, VA 23226
                                        (804) 477-1720
                                        (804) 597-0097 (fax)
                                        jacob@tingen.law

                                        *Attorneys for the Plaintiff*